IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIS BAIRD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 14-cv-1288-MJR-SCW |
| | ) |
| BRYAN PERDUE, | ) |
| JOSHUA KEENER, | ) |
| MARTIN BUCHNER, | ) |
| ERIC HARGETT, | ) |
| and STEPHEN DUNCAN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**REAGAN, Chief Judge:**

**I. INTRODUCTION**

While incarcerated at Lawrence Correctional Center, Willis Baird (Plaintiff) filed a pro se complaint in this Court under 42 U.S.C. 1983, alleging violations of his federally-secured constitutional rights by various correctional officials. More specifically, Baird alleged the use of excessive force by Bryan Perdue and Joshua Keener on July 10, 2014 (Count 1); the use of excessive force by Perdue on September 23, 2014 and September 25, 2014 (Count 2); failure to intervene by Martin Buchner and Eric Hargett for actions occurring on September 25, 2014 (Count 3); deliberate indifference to Plaintiff's serious medical needs by Perdue, Keener, Buchner, and Hargett for the incidents on July 10, September 23, and September 25, 2014 (Count 4); failure to intervene and protect by Stephen Duncan (Count 5); and retaliation by Perdue (Count 6).

Other claims and named Defendants were dismissed by the Court on threshold review under 28 U.S.C. 1915A (Doc. 4). Four "John Doe" Defendants were dismissed by Order dated May 9, 2017 (Doc. 63).

The case comes before the Court on a motion for summary judgment filed by the remaining five Defendants -- Buchner, Duncan, Hargett, Keener, and Perdue (collectively, Defendants) -- along with a supporting memorandum (Docs. 49 and 50). Defendants seek summary judgment on Counts 4, 5, and 6. Plaintiff responded in opposition to the motion (Doc. 58). As explained below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion (it is denied as to Count 6).

## II. SUMMARY OF KEY ALLEGATIONS AND EVIDENCE

Plaintiff's complaint is divided into six counts and presents claims of excessive force, deliberate indifference, failure to protect/intervene, and retaliation. The summary judgment motion only seeks judgment as to Plaintiff's claims that Perdue, Keener, Buchner, and Hargett were deliberately indifferent to Plaintiff's medical needs during the three incidents of excessive force (Count 4), that Duncan ignored Plaintiff's request to intervene and protect him from staff assaults (Count 5), and that Perdue retaliated against Plaintiff (Count 6).

### A. Deliberate Indifference Claims

During the relevant time period, Plaintiff was housed at Lawrence Correctional Center. On July 10, 2014, a shakedown by tactical unit officers was conducted in Plaintiff's housing unit (Doc. 50-1, p. 7). While Perdue was not assigned to the tactical

team on that date, Plaintiff offered affidavits of other inmates stating that they saw Perdue on that date and that he was present for the shakedown (Doc. 58, p. 24-25). In his deposition taken in connection with this case on June 13, 2016 (transcript at Doc. 50-1), Plaintiff testified that during the shakedown, he, along with the other inmates in his unit, were handcuffed and placed outside their cells in a line (Doc. 50-1, p. 5-6). They were ordered to keep their heads down (*Id.*). Plaintiff testified that Perdue slammed Plaintiff's head into the back of the inmate in front of him and told him to keep his head down (*Id.* at p. 6-7). Plaintiff testified that he was dizzy from the hit and that he stumbled but did not fall (*Id.* at p. 6, 8). Plaintiff testified that while marching out of the building, Keener also hit Plaintiff in the back of the head, slamming him into the guy in front of him (*Id.* at p. 6, 10).

Plaintiff further testified that he did not remember asking anyone for medical help on July 10, 2014 and it might have been the next day that he asked for medical care (*Id.* at p. 9). Plaintiff testified that he doubted he said anything to Perdue out of fear but that he might have put in a sick call request on that day or the next (*Id.* at p. 9-10). Nor did he ask Keener for medical care (*Id.* at p. 12). He testified that when he returned to the cellhouse three hours later he spoke with Perdue, possibly about cleaning of the cell that was left a mess after the shakedown, but he did not ask him for medical care (*Id.* at p. 9). Plaintiff stated that by the time he returned to the cellhouse, his symptoms had subsided (Doc. 58 at p. 4). He specifically stated that he did not ask for medical attention from anyone on that date (Doc. 50-1, p. 25).

Plaintiff testified that on September 23, 2014, Perdue kicked Plaintiff's cell door into his head (Doc. 50-1, p. 12). Plaintiff testified that as he was leaving the cell to use the telephone, Perdue kicked the door into Plaintiff (*Id*. at p. 13). The door knocked Plaintiff back, the door bounced off of Plaintiff, and then Perdue kicked the door closed (*Id*.). Plaintiff testified that the door hit the side of his head (*Id*. at p. 14). Plaintiff told Perdue that he kicked the door into his head; Perdue walked away (*Id*. at p. 15, 16). When Perdue returned with Plaintiff's cellmate from the telephones, Plaintiff asked to go to healthcare unit because his head was hurting (*Id*.). Plaintiff testified that Perdue left and may have gone to call healthcare, because Perdue came back 45 minutes later and told Plaintiff he could go to the healthcare unit (*Id*. at p. 16). Perdue then escorted Plaintiff to the healthcare unit, where he was seen by a nurse for a headache (*Id*.; Doc. 50-3). Plaintiff received pain medication for his headache (*Id*. at p. 16-17; Doc. 58, p. 17-19).

On September 25, 2014, Perdue stopped Plaintiff on his way back from the healthcare unit, where he was taking physical therapy, to be frisked (Doc. 50-1, p. 18). Plaintiff testified that he asked for a lieutenant to be present during the frisking (*Id*. at p.18, 19). Martin Buchner showed up and Perdue began to frisk Plaintiff but when he reached his groin, Perdue "karate chop[ped]" Plaintiff in the testicles (*Id*.). Both Martin Buchner and Eric Hargett were present during the incident (*Id*.). Plaintiff testified that he immediately fell to the floor and rolled around on the ground for ten minutes asking for medical assistance (*Id*. at p. 20). Plaintiff testified that Buchner stated he would get

him medical care after they finished their shakedown (*Id*.). Plaintiff got up, and Perdue continued the frisk and hit Plaintiff in the testicles again, although Plaintiff testified that he did not keel over, he just jumped (*Id*.). He testified that the first chop was meant to hurt him, the others did not hurt like the first (*Id*.). Perdue "chopped' him a third time as he was frisking Plaintiff's right leg (*Id*. at p. 20-21). Plaintiff described the first hit as a 20 on a 10 point scale and the other two hits as a 10 (*Id*. at p. 21).

Plaintiff testified that he requested healthcare during the frisking multiple times (Doc. 50-1, p. 23). Buchner told him he could have medical care once the frisking was over (*Id*. at p. 20). After the incident Plaintiff was escorted back to his cell and he did not see anyone from healthcare for the injury (*Id*. at p. 23). Plaintiff testified that he also did not put in a request to go to the healthcare unit upon returning to his cell (*Id*.). Plaintiff testified that when he was let out of his cell two hours later for lunch, he went straight to the showers and declared a hunger strike, because he did not get any medical care (*Id*.). Plaintiff testified that the failure to originally get medical care during the incident was the sole reason for the hunger strike (*Id.* at p. 24). He told the officers to whom he declared his hunger strike that he was not going to eat, because he was not allowed to have medical attention during the earlier frisking episode (*Id*.). He did not ask those officers for medical attention (*Id*.). The only people he requested medical attention from were Buchner, Perdue, and Hargett, when the frisking incident first took place (*Id*.). Plaintiff testified that he asked the segregation officer to have someone check out his testicles, because they were still hurting (*Id*.). He also stated that he may

have requested the same from the lieutenant that walked him over to segregation and that he believes that person was Buchner (*Id.*). Plaintiff never saw anyone from the healthcare unit for this injury (*Id.*).

### B. Failure to Protect Claim

Plaintiff alleges that Warden Duncan failed to protect him from prison officers. Plaintiff testified that Duncan failed to protect him by keeping Plaintiff from identifying the officers who hit him in the back of the head on July 10, 2014 (Doc. 50-1, p. 27). Plaintiff testified that Duncan had the officers put on masks and ordered that inmates keep their heads down, all so that the officers could not be identified (*Id.*). Plaintiff testified that Duncan was responsible for Plaintiff not being able to identify the John Does in this case (*Id.* at p. 28).

Plaintiff also testified that Warden Duncan ordered the shakedown on July 10, 2014 and that he knew that officers were going to use "corporal punishment" on inmates, because he ordered them to wear concealing uniforms (*Id.*). Plaintiff testified that Duncan approached him (Plaintiff) while he was on hunger strike and told him that the shakedown was ordered because officers were getting attacked at other prisons and that he wanted to teach the inmates a lesson (*Id.*).

### C. Retaliation Claim

Relevant to Plaintiff's retaliation claim against Perdue, Plaintiff testified that the two September incidents involving Perdue were done out of retaliation for Plaintiff filing grievances against Perdue and filing a lawsuit. Plaintiff testified that he filed a

lawsuit, *Baird v. Godinez*, Case No. 14-cv-0902, in which the complaint mentioned Perdue's attack on July 10, 2014 (Doc. 50-1, p. 29). While the July 10, 2014 incident was not a claim in the case and Perdue was not a party to the case, Plaintiff noted that Perdue's name was mentioned in the Court's threshold order issued on September 11, 2014 (*Id.*; Doc. 58, p. 21-22). Plaintiff testified that Perdue's friends or Perdue himself could have read the Order prior to the September incidents (Doc. 50-1, p. 30).

Plaintiff stated that he wrote a grievance about the July incident and that he wrote a grievance on September 23, 2014 about the incident with the cell door, and then two days later Perdue conducted the frisk of Plaintiff which led to Perdue hitting Plaintiff in the testicles (*Id.*). Plaintiff testified that he wrote grievances against Perdue in 2013 and in January, February, and March of 2014 (Doc. 50-1, p. 31; Doc. 58, p. 28-39). Plaintiff testified that he believed the previous grievances and the lawsuit were the reasons behind Perdue kicking the door into Plaintiff's head on September 23, 2014 (*Id.*).

He also stated that he believed when he informed the nurse on September 23, 2014 that Perdue had kicked the door into his head, Perdue then retaliated against Plaintiff for that complaint via the frisking incident on September 25, 2014 (*Id.*). Plaintiff testified that Perdue had told him months before, "If I want to get you, I can get you. I have not got you yet," although Plaintiff indicated that he believed this to be a threat to write false disciplinary reports against Plaintiff (*Id.*).

Plaintiff wrote a grievance on August 20, 2014 against Perdue for Perdue transferring Plaintiff so that two inmates, who were friends, could be housed together

(Doc. 59, p. 28). The counselor's response to that grievance indicates that Perdue did not recall the incident and that Plaintiff's statements were false (*Id.*). Plaintiff had previously filed a grievance against Perdue in January 2014 asking for Perdue to be suspended for an incident which occurred in dietary (*Id.* at p. 29). In the counselor's response, Perdue stated that Plaintiff was given a direct order regarding where to sit and that Plaintiff refused to follow that order (*Id.*).

### III.   APPLICABLE LEGAL STANDARDS

#### A.   Summary Judgment Motions

Summary judgment is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  ***Dynegy Mktg. & Trade v. Multi Corp.*, 648 F.3d 506, 517 (7th Cir. 2011),** *citing* **FED. R. CIV. P. 56(a).**

The party seeking summary judgment bears the initial burden of showing -- based on the pleadings, affidavits, and/or information obtained via discovery -- the lack of any genuine issue of material fact.  ***Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).** After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." ***Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986),** *quoting* **FED R. CIV. P. 56(e)(2).** A fact is material if it is outcome determinative under applicable law.  ***Anderson*, 477 U.S. at 248;** ***Ballance v. City of Springfield, Ill. Police Dep't*, 424 F.3d 614, 616 (7th Cir. 2005);** ***Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004).**

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, **477 U.S. at 248.** "A mere scintilla of evidence in support of the nonmoving party's position is not sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Harris N.A. v. Hershey*, **711 F.3d 794, 798 (7th Cir. 2013).**

On summary judgment, the district court construes the facts and draws the reasonable inferences in favor of the non-moving party – here, Plaintiff Fields. *Cole v. Board of Trustees of Northern Illinois University*, **838 F.3d 888, 895 (7th Cir. 2016).** However, the court does not draw every *conceivable* inference from the record, "and mere speculation or conjecture will not defeat a summary judgment motion." *Rockwell Automation, Inc. v. National Union Fire Ins. Co.*, **544 F.3d 752, 757 (7th Cir. 2008) (emphasis added),** *quoting McCoy v. Harrison*, **341 F.3d 600, 604 (7th Cir. 2003).**

### B. <u>Deliberate Indifference</u>

Prison officials are required to ensure that inmates receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan*, **511 U.S. 825, 832 (1994).** The United States Supreme Court has declared that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, **429 U.S. 97, 104 (1976),** *quoting Gregg v. Georgia*, **428 U.S. 153, 173 (1976)**.

Stated another way, prison officials violate the Eighth Amendment if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, **414 F.3d**

645, 652–53 (7th Cir. 2005). *Accord Rodriguez v. Plymouth Ambulance Serv.*, **577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**. A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011),** *citing Johnson v. Snyder*, **444 F.3d 579, 584 (7th Cir. 2006).** The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, **658 F.3d at 750.** *Accord Greeno*, **414 F.3d at 653.** A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** *Accord Farmer*, **511 U.S. at 828 (violating the Eighth Amendment requires deliberate indifference to a substantial risk of serious harm).**

Only if the first (objective) prong is satisfied is it necessary to analyze the second (subjective) prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652–53.** Satisfying the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.** The plaintiff

need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).**

C. <u>**Failure to Protect**</u>

To prevail on a failure to protect claim, a plaintiff must show (1) that he is incarcerated under conditions posing a substantial risk of serious harm, and (2) that the defendant acted with "deliberate indifference" to that danger. *Farmer v. Brennan*, **511 U.S. 825, 834 (1994).**

The first prong of this test requires the inmate to show that prior to the incident, there was a substantial risk that serious harm to him might occur. *Brown v. Budz*, **398 F.3d 904, 910 (7th Cir. 2005)**. The courts have found that an inmate who is assaulted by other inmates has experienced a substantially serious harm. *Brown*, **398 F.3d at 910.**

A plaintiff also must prove that prison officials were aware of a specific, impending, and substantial threat to his safety, often by showing that he complained to prison officials about a specific threat to his safety. *Pope v. Shafer*, **86 F.3d 90, 92 (7th Cir. 1996).** In other words, the defendant had to know that there was a substantial risk that those who attacked Plaintiff would do so, and (armed with this knowledge) fail to take any action. *See Sanville v. McCaughtry*, **266 F.3d 724, 733–34 (7th Cir.2001).**

Deliberate indifference in this context can also be based "upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant [is] not known in advance of the attack), or, in the alternative, an assailant's predatory nature

(though the identity of the ultimate victim [is] not known in advance of attack)." ***Brown*, 398 F.3d at 915.** Conduct that amounts to negligence or inadvertence is not enough to state a failure-to-protect claim. ***Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 1996).**

### D. <u>Retaliation</u>

An official who retaliates against a prisoner because that prisoner filed a grievance violates the prisoner's First Amendment rights. ***DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).** Establishing a claim of retaliation requires a prisoner to show the following: (1) he engaged in a protected activity, (2) he suffered a deprivation likely to prevent future protected activities, and (3) there was a causal connection between the two. *See **Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).**

If the plaintiff prisoner makes this prima facie showing, the burden shifts to the defendant, who can still prevail if he shows that the offending action would have happened even if there had been no retaliatory motive, i.e., if "the harm would have occurred anyway." ***Hawkins v. Mitchell,* 756 F.3d 983, 996 n.10 (7th Cir. 2014),** *quoting **Thayer v. Chiczewski*, 705 F.3d 237, 251-52 (7th Cir. 2012), and *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011).** *See also **Mays v. Springborn*, 719 F.3d 631, 634-35 (7th Cir. 2013).** At summary judgment, "mere speculation" by the plaintiff is insufficient to carry his burden. ***Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 544 F.3d 752, 757 (7th Cir. 2008); *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013).**

## IV. ANALYSIS

### A. <u>Deliberate Indifference</u>

→ **July 10, 2014**

As to the claim that Defendants Perdue and Keener were deliberately indifferent to Plaintiff's injuries on July 10, 2014, the Court finds no evidence of deliberate indifference. Plaintiff acknowledged that he did not tell either Defendant that he was hurt, nor did he ask for medical care. Instead, Plaintiff relies on the fact that Defendants were the ones that hit Plaintiff in the head as evidence that they had knowledge of his injury and need for medical care. But Plaintiff testified that after having his head slapped into the inmate in front of him, he only experienced dizziness and pain. He did not fall down; he only stumbled. He was not bleeding nor was there any swelling. There was no physical evidence that would provide Defendants with subjective knowledge of Plaintiff's medical needs.

Plaintiff further testified that when he returned to his housing unit some three hours later, he no longer was displaying symptoms and did not ask Perdue for care, even though he spoke to Perdue about other matters. There is no evidence that Defendants were aware of Plaintiff's purported need for medical care. There is no evidence that they were deliberately indifferent in not providing Plaintiff with medical care, as they had no knowledge of a serious medical need. Thus, Defendants Perdue and Keener are entitled to summary judgment as to this claim.

→       **September 23, 2014**

Nor does the Court find any evidence that Defendant Perdue was deliberately indifferent to Plaintiff's serious medical needs on September 23, 2014. As to this claim, Plaintiff argues that Perdue delayed Plaintiff's access to medical care. Plaintiff testified that it was approximately one hour before he was able to go to the healthcare unit (Doc. 50-1, p. 26).

A delay in medical treatment *can* constitute deliberate indifference. *See Grieveson v. Anderson*, **538 F.3d 763, 779-80 (7th Cir. 2008)(failure to obtain medical attention for inmate with broken nose for one and a half days could constitute a delay in treatment and deliberate indifference);** *Berry v. Peterman*, **604 F.3d 435, 441 (7th Cir. 2010) ("A significant delay in effective medical treatment may…[constitute] deliberate indifference….where the result is prolonged and unnecessary pain.").** However, the inmate must provide evidence that the defendant's failures caused his injury or pain. *Jackson v. Pollion*, **733 F.3d 786, 790 (7th Cir. 2013).** "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson*, **733 F.3d at 790,** *internal citations omitted.*

In this case, there is no evidence that Perdue was deliberately indifferent in delaying Plaintiff's treatment. Plaintiff testified that when he was first hit with the door

he did not immediately ask Perdue for medical treatment, he just told Perdue he had hit him with the door and asked for an apology (Doc. 50-1, p. 15). When Perdue returned with Plaintiff's cellmate from the telephones, Plaintiff did request medical attention (Doc. 50-1, p. 16). Plaintiff testified that it was 30 minutes from the time Perdue hit Plaintiff with the door that Perdue returned with Plaintiff's cellmate (*Id*. at p. 16). The Court finds no evidence of deliberate indifference between the time the incident occurred and Plaintiff asking for medical care as Perdue did not know prior to Plaintiff requesting care that Plaintiff needed medical attention. Plaintiff testified that he only had a headache and that he did not have any swelling, bleeding, or other outward appearance of symptoms which would put Perdue on notice that Plaintiff needed care (*Id*. at p. 16-17).

After Plaintiff requested care, Plaintiff waited another 45 minutes before Perdue came back and told him that he could go to the healthcare unit (*Id*. at p. 16). Plaintiff testified that during this time period he believed that Perdue called the healthcare unit, and then he returned to tell Plaintiff that he could go to the healthcare unit (*Id.*). The Court finds no evidence of delay nor has Plaintiff offered any evidence that this short period between Plaintiff asking for medical attention and being taken to the healthcare unit caused him any injury. Plaintiff testified that he was taken to the nurse and received pain medication for his headache, which went away after he went to sleep that night (*Id*. at p. 16-17). There is no evidence that this limited delay caused him any harm or that Perdue was deliberately indifferent in taking Plaintiff to the healthcare unit. The

Court finds that Perdue is also entitled to summary judgment as to this claim.

→ **September 25, 2014**

In his last claim of deliberate indifference to medical needs, Plaintiff alleges that Defendants Perdue, Hargett, and Buchner failed to obtain medical care after Perdue "karate chopped" Plaintiff in the testicles. The Court finds no evidence that Plaintiff had a serious medical need at the time of the incident. While Plaintiff testified that he asked the Defendants to take him to the healthcare unit and that he experienced a large amount of pain when initially hit in the groin by Perdue, there is no evidence that Plaintiff's condition was a serious medical need.

The Court acknowledges that a medical condition need not be life-threatening to be serious. It can be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. ***Gayton*, 593 F.3d at 620.** However, there is no evidence that getting hit in the testicles in the manner testified to by Plaintiff constituted a serious medical need. Although Plaintiff testified that he immediately crumbled to the floor after the initial hit, he was able to stand back up and continue with the frisk. Plaintiff also testified that he did not ask for medical care after he was taken back to his cell. Nor did he ask for medical attention from any of the officers to whom he later declared or reported his hunger strike.

While Plaintiff testified that he declared a hunger strike regarding the incident, he testified that the hunger strike was not due to any *continued* failure to take him to the healthcare unit but rather because the Defendants did not take him to the healthcare unit

at the time of the incident (Doc. 50-1, p. 23-24). Further, there is no evidence that Plaintiff would suffer pain or further injury if not treated by a doctor immediately after being hit in the testicles. Defendants are entitled to summary judgment on this claim.

### B. <u>Failure to Protect</u>

In his complaint, Plaintiff alleged that Defendant Duncan ignored multiple direct requests from Plaintiff to protect him from assaults. As fleshed out in his deposition testimony and response to the pending motion, however, Plaintiff claims that Duncan is liable for the excessive force used against him on July 10, 2014, because Duncan ordered the shakedown by the tactical unit. Plaintiff has offered no evidence that he complained to Duncan about a specific threat from officers prior to the July 10, 2014 excessive force incident or that Duncan was aware that officers were going to hit Plaintiff during the shakedown, such that Duncan could be found liable for failing to protect Plaintiff. See *Pope*, **86 F.3d at 92.**

Plaintiff testified that Duncan ordered the shakedown and that he ordered the officers to conceal their identity so that inmates, like Plaintiff, could not later identify them for lawsuits. Plaintiff testified that Duncan was the only one in the prison who could order the shakedown and that Duncan told Plaintiff while he was on a later hunger strike that the shakedown occurred because officers were getting attacked and the inmates needed to be thought a lesson (Doc. 50-1, p. 28). While there is evidence that Duncan ordered the shakedown, there is no evidence that he ordered the Defendants to use excessive force on Plaintiff as Plaintiff contends. Plaintiff testified

that Duncan told him he expected a few lawsuits from inmates, but there is no testimony that Duncan ordered officers to hit Plaintiff or use any other form of excessive force against Plaintiff.

Nor does the fact that guards concealed their identity constitute evidence that Duncan ordered the guards to use excessive force. In fact, Plaintiff testified that he was able to identify Keener by the nametag that he was wearing. So the guards were not entirely concealing their identity to Plaintiff as alleged (Doc. 50-1, p. 10). Defendant Duncan is entitled to summary judgment.

### C. Retaliation Claim

However, as to Plaintiff's retaliation claim against Perdue, Plaintiff has presented enough evidence to survive summary judgment. Defendant Perdue maintains that Plaintiff has no evidence that Perdue knew about Plaintiff's grievances prior to the September 23 and 25, 2014 incidents. But there is evidence in the record that Plaintiff filed grievances of which Defendant Perdue was aware.

For instance, Plaintiff attaches to his response a grievance dated August 20, 2014, which was filed against Perdue for improperly moving inmates to different cells (Doc. 58, p. 28). The counselor's response includes a response from Defendant Perdue indicating that he does not recall the incident and that Plaintiff's claims are false (*Id*.). The counselor's response is dated September 4, 2014, a mere two and one-half weeks prior to the September 23, 2014 incident. Plaintiff also filed a grievance regarding Perdue's actions during the July 10, 2014 shakedown that was responded to by his

counselor on September 3, 2014 (Doc. 1, p. 4). Like the August grievance, this grievance also reflects a response from Perdue indicating that Plaintiff's allegations were false (*Id*.). Plaintiff also testified that he filed a lawsuit in which an Order from this Court mentioned Perdue. That Order was issued on September 11, 2014, just prior to the incidents involving Perdue. The September incidents involving Perdue occurred sufficiently proximate in time to Plaintiff filing grievances against Perdue, and there is evidence that Perdue was aware of Plaintiff's grievances at the very least.

Plaintiff also testified that Perdue previously threatened him, remarking that if he wanted to get Plaintiff, he could. Given the closeness in time and Perdue's alleged statements, a jury could find that Perdue's actions were taken in retaliation for Plaintiff's grievances and lawsuits. As such, the Court **DENIES** Defendant Perdue's motion for summary judgment on the retaliation claim.

V. **CONCLUSION**

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion for summary judgment (Doc. 49).

The motion is **granted** as to Defendants Perdue, Keener, Buchner, and Hargett on Count 4 (claim for deliberate indifference to medical needs) and as to Defendant Duncan on Count 5 (claim for failure to protect/intervene). The motion is **denied** as to the Defendant Perdue on Count 6 (retaliation claim).

In the wake of this Order, the following claims remain for trial:

Count 1: excessive force by Defendants Perdue and Keener on July 10, 2014;

Count 2: excessive force by Defendant Perdue on September 23, 2014 and September 25, 2014 (Count 2);

Count 3: failure to intervene by Defendants Buchner and Hargett for actions occurring on September 25, 2014; and

Count 6: retaliation by Defendant Perdue.

A final pretrial conference will be held by Judge Williams on June 5, 2017 (*see* notice at Doc. 67). Additionally, Plaintiff has a June 2, 2017 deadline to complete and return the form provided by Judge Williams with his May 15, 2017 Order (Doc. 66). Finally, jury trial is set before the undersigned Judge on the June 19, 2017 docket. This case is set that week "behind" *four* other trials (three of which are criminal cases with speedy trial implications). It is unlikely this case will be reached. The Clerk of Court shall provide Plaintiff (who has less ready access to the Court's website due to his incarceration) a copy of the Consent to Magistrate Judge form, should he wish to opt for trial before Magistrate Judge Williams, so as to secure a more firm and definite (and likely sooner) trial date. This is just an option for the parties and is not meant to pressure them.

IT IS SO ORDERED.

DATED May 24, 2017.

*s/ Michael J. Reagan*
Michael J. Reagan
United States District Judge